UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THE UNITED STATES OF AMERICA
for the use and benefit of EC POWER
SYSTEMS ELECTRICAL
CONSTRUCTION COMPANY dba EC
COMPANY,

                              Plaintiff,

        v.

INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA,

                              Defendant.

CASE NO. C15-5326 BHS

ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

        This matter comes before the Court on Defendant Insurance Company of the State

of Pennsylvania's ("ICSP") motion for summary judgment (Dkt. 15).  The Court has

considered the pleadings filed in support of and in opposition to the motion and the

remainder of the file and hereby grants the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

        On May 15, 2015, Plaintiff EC Power Systems Electrical Construction Company

("EC Company") sued ICSP under the Miller Act, 40 U.S.C. § 3131.  Dkt. 1 ("Comp.").

EC Company seeks to recover the expenses it incurred as a result of work delays on a

Kitsap Naval Base repair project.  *Id.* ¶¶ 4, 8, 22, 24.

On January 21, 2016, ICSP moved for summary judgment.  Dkt. 15.  On February 19, 2016, EC Company responded.  Dkt. 22.  On February 26, 2016, ICSP replied.  Dkt. 25.

## II. FACTUAL BACKGROUND

This case arises out of work performed by EC Company in connection with the Electric Substation 2 at the Kitsap Naval Base in Silverdale, Washington.

On September 28, 2011, the Department of the Navy ("Navy") entered into a contract with TolTest, Inc. ("TolTest") to repair the Electrical Substation 2 (the "Project").  Dkt. 24, Declaration of Joel Scroggy ("Scroggy Dec."), Ex. A.  Under the contract, TolTest was required to provide payment and performance bonds for the Project.  *Id.* at 2.  On October 6, 2011, TolTest, as principal, and ICSP, as surety, executed the required payment and performance bonds.  Dkt. 23, Declaration of Angela Otto ("Otto Dec."), Ex. O.

On October 24, 2011, TolTest issued a purchase order to EC Company for the supply of labor and materials in connection with the contract between TolTest and the Navy.  Scroggy Dec., Ex. B at 34.  TolTest agreed to pay EC Company $2,564,818.22 for a little over five months of work.  *Id.* at 46.  The subcontract provides that EC Company "agrees to be bound to TolTest in the same manner and to the same extent as TolTest is bound to the [Navy] under the Prime Contract."  *Id.* at 48.

Under TolTest's original work schedule, EC Company would start its work on January 4, 2012, and finish its work on June 13, 2012.  Scroggy Dec. ¶ 4.  EC Company's start date was delayed several times.  *Id.*  TolTest issued a revised schedule on September

1    11, 2013.  *Id.* ¶ 5.  Under the revised schedule, EC Company would complete its work by

2    February 28, 2014.  *Id.*  Due to additional delays, EC Company's work was not complete

3    as of April 29, 2014.  *Id.*

4         On April 29, 2014, TolTest voluntarily terminated its contract with the Navy

5    because it was "financially unable to complete the performance of the work and to

6    comply with its contractual obligations on the . . . Project."  Dkt. 16, Declaration of

7    Douglas Fine ("Fine Dec."), Ex. 2A.  TolTest filed for Chapter 7 bankruptcy on May 2,

8    2014.  Fine Dec., Ex. 5.

9         On May 7, 2014, ICSP notified the Navy that ICSP was hiring Vertex Companies,

10   Inc. ("Vertex") to complete the Project:

11           Pursuant to the Voluntary Letter of Termination from Toltest, Inc.
             (aka Lakeshore Toltest) and our subsequent discussions, [ICSP] as surety
12           for the above-referenced Contract and Project, hereby appoints and
             delegates Vertex . . . as its representative for the Substation Project. . . .
13           [ICSP] appoints its representatives as an interim measure and to
             mitigate the costs to perform the work as we continue to work with the
14           Navy on the specific terms for completion of the Contract to be defined in a
             mutually agreed Takeover Agreement between [ICSP] and the Navy. . . .
15           We look forward to on-going discussions with the Navy and we share in the
             desire to avoid any unnecessary suspension of site activities during this
16           period of discussion.

17   Otto Dec., Ex. U at 36.  Vertex's representatives contacted EC Company and indicated

18   "that they had been delegated by ICSP to take over the work and that they were interested

19   in having [EC Company] return to the Project to complete its work."  Scroggy Dec. ¶ 6.

20        On May 30, 2014, Vertex contacted EC Company about pricing for air switches.

21   Scroggy Dec., Ex. C at 83.  EC Company told Vertex "it doesn't make sense" for EC

22   Company to price additional work because EC Company was "not under contract with

ORDER - 3

1   Vertex." *Id.*  Vertex subsequently sent EC Company a proposed Subcontract

2   Ratification, Confidential Release and Indemnity Agreement ("Ratification") under

3   which EC Company would agree to complete the balance of its work on the Project for

4   ICSP.  *Id.* at 84–89.  In response, EC Company told Vertex that the proposed Ratification

5   did not address its delay claim against TolTest and that issue would "need to be dealt

6   with as part of any agreement."  *Id.* at 91.  Vertex asked EC Company to compile a list of

7   all outstanding issues.  *Id.*  According to Vertex, "[t]hese items should be memorialized

8   in the Ratification . . . ."  *Id.*

9           On June 5, 2014, Vertex and EC Company discussed by phone the proposed

10  Ratification, EC Company's pending change orders, EC Company's willingness to

11  continue work on the Project, and EC Company's delay claim.  Scroggy Dec. ¶ 9.  That

12  same day, a Vertex employee internally recommended "mov[ing] forward without [EC

13  Company]" because EC Company would not "play ball" with the proposed Ratification.

14  Otto Dec., Ex. P at 9.  In response, another Vertex employee "agree[d] we need to discuss

15  all subcontractor claims and how we want to handle but at the same time not necessarily

16  let subcontractors walk off the project if we have legal standing to require them to finish

17  their work.  At a minimum, we need to document their refusal to move forward."  *Id.*

18          On June 9, 2014, a Vertex employee followed up with EC Company by email.

19  Scroggy Dec., Ex. D at 96.  The email states:

20          As I mentioned on the call, Vertex will have the responsibility to
        complete the project.  To do so, we will need a team of subcontractors that
21      are committed to the project and their scopes.
            Please correct me if I am mistaken, but I sensed ambiguity.  I
22      understood that EC would prefer to not return.  I also heard that EC would

ORDER - 4

abide by its agreement with LTC if enforced.  The form of this enforcement
I cannot address.

       Furthermore, at this time, Vertex is not in a position to address EC's
large claim, nor do we have such authority.  So I cannot offer a rapid
settlement as incentive for returning to work.

*Id.* Vertex then outlined "three possible options" for EC Company to consider:

    1.      EC Company completes its contract and would agree to newly
           priced work like the air switches. . . . EC would have to deal with
           [ICSP] for its claim. . . .
    2.      EC could receive a termination for convenience without
           penalty . . . . EC could pursue its claim or not. . . .
    3.      EC could receive a termination. . . .

*Id.*

       On June 12, 2014, EC Company responded to Vertex's email.  Scroggy Dec., Ex.

E at 98–99.  EC Company acknowledged that "Vertex is not in a position to address EC

Company's delay claim, and will proceed directly with the surety on that issue."  *Id.* at

99.  EC Company also told Vertex it was "ready and willing to perform [the] remainder

of the work under its subcontract."  *Id.*  As for EC Company's role moving forward, EC

Company proposed two options: (1) EC Company completes its work on the Project; or

(2) EC Company "walk[s] away from the Project due to the extreme delays and current

conditions, not contemplated by EC Company's subcontract with TolTest."  *Id.*  Finally,

EC Company advised Vertex that it would not agree to release its claims against TolTest

or ICSP under either scenario.  *Id.*

       On July 22, 2014, Vertex informed EC Company that "we are on hold, pending

additional direction from [ICSP] and the Navy."  *Id.* at 98.  Vertex explained:

    Until an agreement is reached between [ICSP] and the Navy, [Vertex]
    cannot recommend a course of action regarding the EC subcontract.  We

are keeping a termination for convenience option open and will likely get pricing for EC's remaining scope plus the anticipated changes related to EC's work and related, adjacent work.  That is all [Vertex] can provide at this time.

*Id.*

On September 24, 2014, EC Company's attorney, Evan Lenneberg ("Lenneberg"), issued a written demand to ICSP, Vertex, TolTest, and the Navy regarding EC Company's role in the Project and its outstanding claims.  Scroggy Dec., Ex. G. Lenneberg reiterated the two options proposed by EC Company and emphasized that EC Company would not release its claims against any entity under either scenario.  *Id.* Lenneberg also notified the recipients that EC Company would pursue a Miller Act claim absent a response within ten business days.  *Id.*

On October 9, 2014, Vertex notified Lenneberg that it had received the demand letter, and requested Lenneberg to resend copies of documents that appeared to be incomplete.  Scroggy Dec., Ex. L at 124.  Lenneberg followed up on November 11, 2014, noting that EC Company had "yet to receive any meaningful response" from Vertex and "will have to move forward with its bond claim."  *Id.*

On November 21, 2014, a Vertex employee, Bethany Boomer ("Boomer"), asked EC Company to resend its invoices because EC Company's file had changed hands. Scroggy Dec., Ex. H.  During a conference call that same day, EC Company "indicated that it was willing to complete the work on the Project and Vertex indicated that it intended that [EC Company] complete that work."  Scroggy Dec. ¶ 15.  EC Company followed up with Boomer about Vertex's proposal on November 25, 2014.  Scroggy

Dec., Ex. H at 107.  Boomer responded that Vertex was "working on a few additional approvals."  *Id.*

On December 2, 2014, a Vertex employee asked Boomer for an update on the status of EC Company's claim because he "would like to call and check in with EC [Company] this week, in order to keep the conversations upbeat and fresh."  Otto Dec., Ex. Q at 14.

EC Company's Senior Vice President, Joel Scroggy ("Scroggy"), asked about the status of EC Company's claim on December 23, 2014.  Otto Dec., Ex. R.  In response, Boomer stated Vertex had just received EC Company's proof of claim form.  *Id.*

On January 5, 2015, Lenneberg sent a Notice of Miller Act Bond Claim to ICSP, Vertex, TolTest, and the Navy.  Scroggy Dec., Ex. J.  The notice stated that EC Company had a claim against the payment bond for $59,269.50 in unpaid work on the Project, as well as a claim for $648,086 in delay damages.  *Id.*

ICSP acknowledged receipt of EC Company's unpaid work claim and requested additional documentation on January 28, 2015.  Scroggy Dec., Ex. K.  The acknowledgement letter did not mention the delay claim.  *See id.*  The letter also advised EC Company that "this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter."  *Id.*

On February 6, 2015, Lenneberg emailed Vertex to check on the status of EC Company's claims.  Scroggy Dec., Ex. L at 123.  Lenneberg explained that "EC

1  Company still has an open subcontract for the project and hasn't received direction on

2  how to proceed or termination of its contract." *Id.*

3      Boomer sent EC Company a partial release for the unpaid work claim on February

4  10, 2015.  Scroggy Dec., Ex. L. at 120.  Boomer asked EC Company to "sign and remit

5  the attached partial release, so that we can pay your due invoice while we work through

6  the remainder of the delay claim." *Id.*

7      That same day, Boomer contacted Lenneberg about EC Company's delay claim.

8  *Id.* at 123.  Boomer notified Lenneberg that she had sent EC Company a partial release

9  because Vertex would "like to at least get EC paid for work that they've completed as we

10  continue to work through their delay claim." *Id.*  Boomer informed Lenneberg that

11  "[w]e've also asked EC if they'd be willing to bid on the project's completion" and that

12  "[w]e'd very much like to continue working with EC." *Id.*  Finally, Boomer asked

13  Lenneberg to provide information regarding EC Company's delay claim:

14      To properly address the delays, we would need to eliminate the concurrent
        costs claimed by EC with those costs already covered in the change orders
15      issued. . . . We will need documentation supporting that EC's claimed costs
        are in excess of those provided for in the change orders . . . . [W]e will need
16      to see actual costs and EC's overhead rate rather than a per-diem rate for
        the delays.  If you have any documentation supporting these actual costs,
17      we'd be happy to add them to our continued review of the delay claim.

18  *Id.*

19      Between February 25 and March 2, 2015, Vertex and EC Company exchanged

20  revised versions of the partial release.  *See* Scroggy Dec., Ex. M.  During these

21  exchanges, EC Company informed Vertex on two occasions that EC Company needed to

22  preserve its right to assert its delay claim.  *Id.* at 128–29.

ORDER - 8

1    On March 16, 2015, EC Company signed the final partial release for work

2  performed through February 1, 2015.  Scroggy Dec., Ex. N.  The partial release

3  "expressly reserves [EC Company's] bond claim and related claims arising from project

4  delays and associated impacts."  *Id.* at 133.  EC Company received a payment for

5  $56,302.06 from ICSP.  Scroggy Dec. ¶ 22.

6    According to Scroggy, "in May 2015, [EC Company] learned that Vertex was

7  accepting bids to finish the project, including [EC Company's] scope of work.  [EC

8  Company] understood this to be an indication that its Contract was effectively terminated

9  at that time."  *Id.* ¶ 23.

10                              **III. DISCUSSION**

11    ICSP moves for summary judgment, arguing EC Company's suit is barred by the

12  statute of limitations.  Dkt. 15.

13  **A.      Summary Judgment Standard**

14    Summary judgment is proper only if the pleadings, the discovery and disclosure

15  materials on file, and any affidavits show that there is no genuine issue as to any material

16  fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

17  The moving party is entitled to judgment as a matter of law when the nonmoving party

18  fails to make a sufficient showing on an essential element of a claim in the case on which

19  the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

20  323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

21  could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

22  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

1   present specific, significant probative evidence, not simply "some metaphysical doubt").

2   *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

3   if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

4   jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

5   U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

6   626, 630 (9th Cir. 1987).

7         The determination of the existence of a material fact is often a close question.  The

8   Court must consider the substantive evidentiary burden that the nonmoving party must

9   meet at trial—e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

10  U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

11  issues of controversy in favor of the nonmoving party only when the facts specifically

12  attested by that party contradict facts specifically attested by the moving party.  The

13  nonmoving party may not merely state that it will discredit the moving party's evidence

14  at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

15  *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

16  nonspecific statements in affidavits are not sufficient, and missing facts will not be

17  presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

18  **B.    Statute of Limitations**

19        ICSP contends EC Company's suit is untimely under the Miller Act.  Dkt. 15.  A

20  suit brought under the Miller Act must be filed "no later than one year after the day on

21  which the last of the labor was performed or material was supplied by the person bringing

22  the action."  40 U.S.C. § 3133(b)(4).  The Miller Act's statute of limitations is a

1    "procedural requirement rather than a jurisdictional requirement." *U.S. ex rel Air Control*

2    *Tec. Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2012).  Thus, "a

3    defendant may, if the circumstances warrant, be estopped from defending on the ground

4    that the action was not commenced within the [statute of limitations]." *U.S. for Use of E.*

5    *E. Black Ltd. v. Price-McNemar Constr. Co.*, 320 F.2d 663, 666 (9th Cir. 1963).

6          EC Company filed its complaint on May 15, 2015.  Comp.  In order for EC

7    Company's suit to be timely, EC Company must have performed work or supplied

8    material on or after May 15, 2014.  EC Company admits that it did not perform work or

9    supply material after TolTest's termination date, which was more than a year before EC

10   Company filed suit.  Dkt. 22 at 10; *see also* Fine Dec., Ex. 6 at 3–4.  EC Company's suit

11   is therefore untimely under the Miller Act.

12   **C.    Equitable Estoppel**

13         EC Company argues ICSP should be equitably estopped from asserting the statute

14   of limitations as an affirmative defense.  Dkt. 22 at 12.  EC Company contends ICSP's

15   representative, Vertex, caused EC Company to defer filing suit because Vertex

16   represented that (1) EC Company would continue its work on the project, and (2) Vertex

17   or ICSP were processing EC Company's delay claim.  Dkt. 22 at 14–16.

18         "In order to assert successfully the doctrine of equitable estoppel, a plaintiff must

19   show that the defendant's conduct was so misleading as to have caused the plaintiff's

20

21

22

1   failure to file suit." *Atkins v. Union Pac. R. Co.*, 753 F.2d 776, 777 (9th Cir. 1985).[1]

2   Specifically, EC Company must show that (1) Vertex knew the facts, (2) Vertex intended

3   its conduct to be acted upon or gave EC Company the right to believe it so intended, (3)

4   EC Company was ignorant of the true state of facts, and (4) EC Company reasonably

5   relied on Vertex's conduct to its detriment. *See U.S. for Use of Youngstown Welding &*

6   *Engineering Co. v. Travelers Indem. Co.*, 802 F.2d 1164, 1168 (9th Cir. 1986).

7   "[E]quitable estoppel will not apply to a claim such as this one unless the plaintiff shows

8   either (1) an affirmative statement that the statutory period to bring the action was longer

9   than it actually was; (2) promises to make a better settlement of the claim if plaintiff did

10   not bring the threatened suit; or (3) similar representations or conduct on the part of the

11   defendants." *Atkins*, 753 F.2d at 777.

12       At the outset, EC Company has not shown that Vertex misrepresented the statute

13   of limitations period, agreed to settle EC Company's delay claim in return for a promise

14   not to sue, or made similar representations or promises.

15       EC Company has also failed to demonstrate that Vertex's conduct was misleading.

16   The record shows that Vertex and EC Company discussed whether or not EC Company

17   would return to the Project to complete its work under a contract with ICSP, and if so,

18   what the terms of that contract would be.  In May 2014, Vertex sent EC Company a

19   proposed Ratification.  Between May 2014 and September 2014, Vertex and EC

20

21       [1] EC Company's equitable estoppel defense is governed by federal common law as this
    suit arises under a federal statute. *See Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 762 (9th Cir.
22   1981).

1    Company discussed the proposed Ratification and the possible options for EC Company

2    moving forward.  There is no evidence, however, that the parties reached an agreement

3    with respect to the proposed Ratification or EC Company's return to the Project.

4    Although Vertex indicated it would like to continue working with EC Company, EC

5    Company has not pointed to promises Vertex made with respect to EC Company's return

6    to the Project.  Indeed, Vertex told EC Company that it could not recommend a course of

7    action with respect to EC Company's subcontract in July 2014.  As late as February

8    2015, the evidence shows that Vertex merely asked EC Company if it would be willing to

9    bid on the Project's completion.

10           With respect to EC Company's delay claim, Vertex requested additional

11   documentation from EC Company in January and February 2015.  Vertex further advised

12   EC Company that it was not waiving any of the rights or defenses that Vertex or ICSP

13   may have.  Scroggy Dec., Ex. K.  Although Vertex agreed to pay EC Company's unpaid

14   work claim, Vertex told EC Company it was continuing to work through the delay claim.

15   Vertex also worked with EC Company's counsel on drafting a partial release that

16   expressly preserved EC Company's right to assert the delay claim.  Viewing the evidence

17   in the light most favorable to EC Company, a reasonable juror would not conclude that

18   Vertex's conduct was misleading.

19           Even assuming Vertex's conduct could be considered misleading, no reasonable

20   juror would conclude that EC Company reasonably relied on Vertex's conduct.  As a

21   preliminary matter, EC Company has not presented evidence that it actually relied on

22   Vertex's statements or conduct in delaying to file suit.  EC Company has also not pointed

1  to any statements or conduct by Vertex that would justify any reliance.  The record shows

2  that EC Company and Vertex engaged in discussions between May 30, 2014 and March

3  16, 2015.  Although Vertex indicated it was interested in EC Company returning to

4  complete its work on the Project and was reviewing EC Company's delay claim, there is

5  no evidence that Vertex misrepresented the statute of limitations period, agreed to settle

6  or pay EC Company's delay claim, or made similar promises.

7        EC Company was also represented by counsel as of September 2014.  The record

8  shows that EC Company's counsel was aware of EC Company's delay claim and that

9  Vertex notified him that Vertex and ICSP were not waiving any rights or defenses.  EC

10  Company concedes that its discussions with Vertex ceased in March 2015 when EC

11  Company signed the partial release.  Dkt. 22 at 16.  The partial release expressly reserved

12  EC Company's right to pursue its delay claim.  Even viewing the evidence in the light

13  most favorable to EC Company, no reasonable juror would conclude that a party

14  represented by counsel justifiably relied on Vertex's conduct in delaying to file suit until

15  May 15, 2015.

16        EC Company nevertheless argues that Vertex's internal emails establish that

17  Vertex intended EC Company to defer filing suit.  Dkt. 22 at 14–15.  In one email

18  exchange from June 2014, a Vertex employee recommends "mov[ing] forward without

19  [EC Company]," while another suggests "not necessarily let[ting] subcontractors walk off

20  the project."  Otto Dec., Ex. P at 9.  In another email in December 2014, a Vertex

21  employee says he wants to keep conversations with EC Company "upbeat and fresh."

22  Otto Dec., Ex. Q at 14.  Even assuming Vertex's internal emails (of which there is no

1    evidence EC Company had knowledge of) show that Vertex intended for EC Company to

2    defer filing suit, EC Company has not shown affirmative conduct by Vertex that was so

3    misleading as to cause EC Company's failure to timely file suit.  *See Atkins*, 753 F.2d at

4    777.

5           For these reasons, the Court concludes that EC Company has failed to show

6    equitable estoppel should be applied in this case.

7    **D.      Equitable Tolling**

8           Finally, EC Company contends that equitable tolling applies.  Dkt. 22 at 17.

9    Equitable tolling focuses on "whether there was excusable delay by the plaintiff: If a

10   reasonable plaintiff would not have known of the existence of a possible claim within the

11   limitations period, then equitable tolling will serve to extend the statute of limitations for

12   filing suit until the plaintiff can gather what information he needs."  *Johnson v.*

13   *Henderson*, 314 F.3d 409, 414 (9th Cir. 2002).  "However, equitable tolling does not

14   postpone the statute of limitations until the existence of a claim is a virtual certainty."

15   *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000), *overruled on other*

16   *grounds by Scoop-Gonzalez v. INS*, 272 F.3d 1176 (9th Cir. 2011).

17          EC Company argues it believed its delay claim was not "ripe" because Vertex

18   indicated it wanted EC Company to continue working on the Project.  Dkt. 22 at 17.  This

19   argument is unavailing.  The test for equitable tolling is not whether EC Company knew

20   that its delay claim was a virtual certainty, but rather whether EC Company knew it had a

21   possible delay claim.  EC Company's delay claim stems from its work on the Project

22   under its subcontract with TolTest.  Viewing the evidence in the light most favorable to

1    EC Company, EC Company knew it had a possible delay claim when it learned TolTest

2    voluntarily terminated its contract with the Navy.  Indeed, EC Company concedes that it

3    notified Vertex of its delay claim "as soon as it learned that TolTest terminated its

4    Contract with [the Navy]."  Dkt. 22 at 14; *see also* Scroggy Dec., Ex. C at 91 (raising

5    delay claim with Vertex on May 30, 2014).  Moreover, EC Company was represented by

6    counsel as of September 2014.  *See Johnson*, 314 F.3d at 414 ("[O]nce a claimant retains

7    counsel, tolling ceases because she has gained the means of knowledge of her rights and

8    can be charged with constructive knowledge of the law's requirements." (quoting *Leorna*

9    *v. U.S. Dep't of State*, 105 F.3d 548, 551 (9th Cir. 1997)).  EC Company's counsel

10   formally notified Vertex and ICSP of EC Company's delay claim in January 2015.

11         Although EC Company may have believed its delay claim was not a virtual

12   certainty because it was not yet "ripe," the evidence shows that EC Company

13   nevertheless knew it had a *possible* delay claim well before the statute of limitations ran.

14   EC Company has failed to show equitable tolling applies.

15                                        **IV. ORDER**

16         Therefore, it is hereby **ORDERED** that ICSP's motion for summary judgment

17   (Dkt. 15) is **GRANTED**.  The Clerk shall close this case.

18         Dated this 12th day of April, 2016.

19

20                                              _____
                                                BENJAMIN H. SETTLE
21                                              United States District Judge

22

ORDER - 16